UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES BROWN,

  Petitioner,

v.                                               Case No.   15-C-635

MARC CLEMENTS,

  Respondent.

## DECISION AND ORDER

Petitioner James Brown filed this habeas corpus action on May 27, 2015. Judge Pepper screened the petition and concluded that there were potentially four viable, exhausted claims in the petition. (ECF No. 6.) More recently, the parties consented to the jurisdiction of the undersigned magistrate judge. For the reasons given below, the petition will be denied.

### BACKGROUND

In Milwaukee County Circuit Court, the petitioner pled guilty to two counts of second-degree sexual assault with use of force. The first criminal complaint, filed in December 2011, alleged that the petitioner was one of two men who parked a van and then pulled a woman known as O.K. inside the van. After they drove away, the petitioner took money from O.K. and then raped her while choking her. He then dumped her out of the car and left. The first complaint alleged kidnapping, robbery with use of force, and second-degree sexual assault.[1]

---

[1] The facts are taken from the decision of the Wisconsin Court of Appeals, ECF No. 13-8.

The following year, the State of Wisconsin filed another complaint, this time alleging that in 2010 (two years earlier) the petitioner came up behind a woman known as V.R.M. and hit her on the head, knocking her to the ground. (The State explained that DNA had connected the petitioner to the 2010 victim.) He then dragged her to a car and threw her inside, strangling her in the process. When she said she had no money, the petitioner then choked her harder and raped her. The second complaint alleged kidnapping, attempted robbery, false imprisonment, strangulation and suffocation, and second-degree sexual assault.

Both victims testified at two separate preliminary hearings. Victim O.K. testified on January 4, 2012. The following month, the petitioner's mother received a letter purportedly from O.K. ECF No. 15 at 12. The letter was signed by O.K. and notarized. ECF No. 13-8 at 14. The letter stated that O.K. had "made up the story about Mr. Brown," that he "did not harm" her, and that she did not want to "let an innocent man sit in jail over a lie I made up." *Id.* The existence of the letter arose at an April 3, 2012 revocation hearing in connection with a prior sentence. The administrative law judge, in a written decision, found the letter's provenance questionable in view of the police interview of O.K. immediately after the assault, as well as the fact that no one had testified to the authenticity of the hearsay contained in the letter. *Id.* at 14. The letter apparently did not surface again; in fact, at a May 31, 2012 conference, the State confirmed that O.K. had been located (in Las Vegas) and would be flying back to testify against the petitioner.

Eventually the State moved to join the two cases for trial given that the two crimes were "of the same or similar character." Wis. Stat. § 971.12(1). The trial court joined the cases, finding that the petitioner would not be prejudiced by the joinder since even if the trials occurred separately, each crime would be admissible in both cases as other-acts evidence. The

2

petitioner pled guilty to one count of second-degree sexual assault in each case. As part of the plea deal, the State agreed that it would recommend prison time but leave the length of the sentence entirely to the court. The trial court sentenced the petitioner to two consecutive seven-year terms of incarceration.

On appeal, appellate counsel filed a no-merit report raising several potential issues, none of which the court of appeals believed were meritorious. In this habeas petition, the petitioner brought claims alleging ineffective assistance of trial and appellate counsel, violation of due process due to an involuntary plea, and violation of the plea agreement by the State.

## ANALYSIS

This habeas petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act, known as AEDPA. "The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Habeas is not simply another round of appellate review. 28 U.S.C. § 2254(d) restricts habeas relief to cases in which the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

A decision is "contrary to" Supreme Court precedent if the state court "contradicts the governing law set forth in [Supreme Court] cases." *Coleman v. Hardy*, 690 F.3d 811, 814 (7th

Cir. 2012). A state-court decision is an "unreasonable application of" clearly established law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. As for the determination of the facts, federal courts will not "characterize these state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.' Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference. If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.'" *Brumfield v. Cain*, 576 U.S. 305, 135 S. Ct. 2269, 2277 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010) (other citations omitted)).

The scope of federal review of state court decisions on habeas is "strictly limited" by 28 U.S.C. § 2254(d)(1). *Jackson v. Frank*, 348 F.3d 658, 661 (7th Cir. 2003). The unreasonable application standard is "a difficult standard to meet." *Id*. at 662. Even an incorrect or erroneous application of the federal precedent will not justify habeas relief; rather, the state court application must be "something like lying well outside the boundaries of permissible differences of opinion." *Id*. at 662 (internal citation omitted).

1. **Ineffective Assistance**

The petitioner asserts that trial counsel was ineffective for failing to conduct a proper investigation, object at sentencing when the State violated the plea agreement, and object to joinder of the two criminal cases. ECF No. 15 at 7. The standard for evaluating counsel's performance is *Strickland v. Washington*, 466 U.S. 668 (1984). In evaluating such claims, I must take "a highly deferential look at counsel's performance," in which "counsel is strongly

4

presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."

### A. Joinder

The State first argues that the petitioner, by pleading guilty, has waived claims based on his counsel's handling of the witness recantation letter and his handling of the joinder issue. With respect to joinder, the court of appeals found that by pleading guilty, the petitioner forfeited his right to appeal the trial court's granting of the motion for joinder. ECF No. 13-8 at 7. It further concluded that there was no merit to any challenge to the joinder.

The State cites *Tollett v. Henderson*, 411 U.S. 258, 267 (1973), in which the Supreme Court found that a guilty plea represents "a break in the chain of events" preceding it in the criminal process. "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Id.* Because any ineffectiveness of counsel regarding the issue of joinder had occurred *prior* to the plea, and because the joinder issue does not implicate the voluntariness of his plea, the State is correct that the petitioner is barred from raising such a challenge. *Tollett,* 411 U.S. at 267.

It is clear, moreover, that the claim would not succeed even if the plea did not preclude consideration of the argument. As the court of appeals concluded, there was no merit to the claim that the trial court had improperly joined the cases. It would therefore be impossible to conclude that counsel's performance was deficient at all, much less that it fell below the *Strickland* standard. Finally, I note that it appears counsel *did* oppose the joinder. *See* ECF No. 13-8 at 4. Although counsel did not seek an interlocutory appeal, as the petitioner believes he

5

should have, such a tactic is hardly required in order to live up to adequate standards of performance.

### B. Recantation Letter

The petitioner also argues his counsel was ineffective for failing to fully investigate the authenticity of the recantation letter from witness O.K. Counsel did hire an investigator to look into the letter's authenticity. Counsel explained in an affidavit that the investigator interviewed O.K., and O.K. denied writing the letter. ECF No. 13-7. Nevertheless, the petitioner asserts that counsel never obtained a handwriting analysis, the investigator never talked to the notary who notarized the signature, and the investigator spoke with O.K. over the phone, rather than in person. ECF No. 15 at 11-12.

The State argues that this claim is also waived by virtue of the plea agreement. As with the joinder issue, any issues about counsel's performance regarding the recantation letter had occurred well before the petitioner's guilty plea in September 2012. As the court of appeals found, the letter had been discussed in a revocation hearing in April of that year, and the petitioner had also admitted that his lawyer gave him a copy of the investigation report regarding the letter. "[A]t the time Brown pled guilty, he either knew the results of the investigation of the letter's authenticity—as his trial counsel claims—or he believed that there was a recantation letter that could potentially defeat the charge against him. Either way, he still chose to plead guilty." ECF No. 13-8 at 17. The court further recognized that a guilty plea is not merely a generic statement of guilt, but a particularized admission to the facts alleged in the criminal complaint. By pleading guilty and admitting to those facts, the petitioner explicitly rejected any suggestion that O.K.'s recantation letter was authentic; at a minimum, the court found, he "forfeited the right to continue to litigate the authenticity of

the letter, the victim's credibility, and the facts concerning the assault." *Id.* at 18. Additionally, given counsel's belief that the letter was *not* authentic, there would have been no reason for counsel to conduct further inquiry or press the issue with the trial court.

Because the petitioner's challenge does not relate to the plea itself, it is clear that the guilty plea precludes any challenge to counsel's performance regarding the letter. *Tollett,* 411 U.S. at 267. As explained earlier, the Supreme Court has found that a guilty plea is a "break in the chain" that precludes further litigation: "the focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity." *Id.* at 267, 266. Wholly apart from the guilty plea, the claim lacks any merit. The petitioner's counsel did conduct an investigation of the letter. Counsel explained that he hired an investigator, who interviewed O.K., and O.K. denied writing the letter. ECF No. 13-7. O.K. also expressed a willingness to return to Wisconsin from Nevada and testify against the petitioner, something she likely would not do had she recanted. Counsel also stated that he had been informed by the district attorney's office that O.K. had not written the letter. Given the serious doubts about the letter's authenticity, counsel was not obligated to conduct any further investigations.

### C. Violation of the Plea Agreement

The petitioner also asserts that counsel's performance was substandard because he failed to object at the sentencing hearing when the State violated the plea agreement. Part of the agreement, the prosecutor explained, was that "the State is going to recommend prison, and I'm leaving the amount [of time] and all the particulars up to the discretion of the Court." ECF No. 13-13 at 3. The petitioner now argues that the State pulled the rug out from him when, at the sentencing hearing, the prosecutor stated that the petitioner was involved in

7

Case 2:15-cv-00635-SCD   Filed 05/08/20   Page 7 of 12   Document 26

repeated violent behaviors, had an extensive and serious record, was becoming more dangerous, and had mental health problems. ECF No. 13-14 at 5-17. The prosecutor also noted there was a "level of depravity" and "cruelness" to the crimes, *Id.* at 15, and further that the crimes were the sort of "scary stuff" that people associate with sexual assaults—"getting grabbed off the street, taken to some place . . and then being sexually assaulted," *Id.* at 9-10. The prosecutor also described how the victims' lives had been turned upside down and how one of the victims had blacked out during the sexual assault. *Id.* at 6. The prosecutor believed the petitioner "needs a period of imprisonment that punishes him, that addresses his rehabilitative needs . . . so I am asking the Court to place him in prison." *Id.* at 15-16.

The petitioner argues that the kind of language used by the prosecutor was a violation of their plea agreement. As the court of appeals found, however, the plea agreement did not require the State to "stand silent," but merely to abstain from recommending a specific term of imprisonment. ECF No. 13-8 at 12. The court found, therefore, that the State had not violated the plea agreement and there was no basis for counsel to have argued the point. This finding is clearly reasonable. Moreover, the trial judge undoubtedly was already aware of the serious nature of the crime by virtue of the complaints and the plea agreement. It is therefore unlikely that anything said by the prosecutor would have changed the sentence imposed. In any event, because there were no grounds to object or take other action, the petitioner cannot show that his counsel's performance violated the standard set forth in *Strickland*. For the same reasons, the petitioner cannot show that his independent claim that the State violated the plea agreement has any merit.

### D. No-merit Report

The petitioner also challenges appellate counsel's decision to file a no-merit report, although his argument on this point is at best cursory. In this case, the court of appeals gave careful consideration to each of the potential appellate issues and heard from the petitioner in response. As recounted above, the court of appeals found no appellate issues of merit, and neither can this court. Accordingly, it is impossible to conclude that counsel's decision to file a no-merit report could be substandard advocacy under the *Strickland* standard.

### 2. Guilty Pleas

The petitioner also argues that his two guilty pleas were not knowingly, intelligently, and voluntarily entered. He asserts that he has ADHD and other learning disabilities, which required placement in a special education program, and his ability to understand basic conversation is below normal. ECF No. 15 at 17. Nevertheless, the trial court did not inquire as to these matters. In the petitioner's view, this means the court failed to ensure that his plea was voluntarily and knowingly entered. The court of appeals rejected this argument, noting that the trial court had conducted a "thorough" plea colloquy to confirm that the petitioner understood the agreement as well as the charges and penalties he faced. ECF No. 13-8 at 8.

> The signed guilty plea questionnaires that the trial court reviewed both indicated that Brown had completed twelve years of schooling and had achieved "a high school diploma, GED, or HSED." Further, the questionnaires indicated that Brown had not taken drugs or alcohol in the last twenty-four hours, and the trial court explicitly confirmed that with Brown. The trial court asked Brown numerous questions to confirm that he understood the proceedings and also explicitly inquired whether he had "any questions about what we are doing here today." Brown's answers all indicated he understood. While the trial court did not comment on Brown's education, it is apparent that the trial court assessed Brown's comprehension and determined that he understood the proceedings.

ECF No. 13-8 at 9. The court of appeals relied on *State v. Bangert*, 389 N.W.2d 12, 19 (Wis. 1986), for its analysis of the requirement that a plea must be knowing, voluntary, and made intelligently. *Bangert* itself relied in part on *Boykin v. Alabama*, 395 U.S. 238 (1969) and *Brady v. United States*, 397 U.S. 742, 748, n. 6 (1970). Thus, even though the court of appeals here did not explicitly rely on federal Constitutional law in reaching its decision, it is clear that the basis of its analysis was grounded in rulings from the United States Supreme Court. Moreover, the § 2254(d) analysis asks whether the state court's decision is contrary to clearly established federal law, *not* whether the state court actually *cited* that law. *See Early v. Packer*, 537 U.S. 3, 8 (2002). The question, therefore, is whether the court's ruling was an unreasonable application of *Boykin* and *Brady*.

    *Boykin* held that judges must make a record supporting the finding that the defendant's plea was intelligent and voluntary. 395 U.S. at 242. It did not, however, impose specific inquiries or require "magic words" that judges must utter. *Brady* reaffirmed that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." 397 U.S. at 748. Here, the court of appeals properly considered the nature of the plea colloquy, as well as the fact that the petitioner had completed high school or obtained a GED. Further, it noted that the trial court had "asked Brown numerous questions to confirm that he understood the proceedings." ECF No. 13-8 at 9. The fact that the trial court did not make a specific inquiry into the petitioner's learning disabilities does not mean the plea was involuntary; the question isn't whether the petitioner had average ability to understand things (many criminal defendants suffer from mental infirmities)—it is whether, at that moment, with the advice of counsel, he understood what he was doing and the consequences of his act. *See Brady,* 397

10

U.S. at 748. Many individuals have learning disabilities or ADHD and are nevertheless able to understand relevant circumstances and the consequences of their decision. All of the petitioner's responses to the trial judge's many questions indicated that he fully understood his decision to plead guilty. ECF No. 13-13. The trial judge explained what the State would have to prove, explained what the maximum penalties were, and obtained the petitioner's agreement that he understood the rights he was giving up by pleading guilty. *Id.* at 4-7. The petitioner further testified that he had read the criminal complaints and agreed that the facts alleged therein were true. *Id.* at 8-9. In reaching its conclusion that there was no basis to challenge the pleas, the court of appeals did not unreasonably apply any controlling Supreme Court precedent, nor did it base its decision on an unreasonable determination of the facts, in finding no merit to this issue. *See* 28 U.S.C. § 2254(d).

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

For a certificate of appealability to issue, a petitioner must show that "reasonable jurists" would find this Court's "assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Here, I cannot conclude that the assessment of the merits of the petitioner's claims is debatable by reasonable jurists. Accordingly, a certificate of appealability will be denied.

11

## CONCLUSION

For the reasons given above, the petition is **DENIED** and the case is **DISMISSED**. A certificate of appealability is **DENIED**. The clerk will enter judgment accordingly.

**SO ORDERED** this 8th of May, 2020.

STEPHEN C. DRIES
United States Magistrate Judge